## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

RTW, Inc.,

        Plaintiff,

        v.          **MEMORANDUM OF LAW AND ORDER**
                       Civil File No. 05-745 (MJD/SRN)

Carolina Casualty Insurance Company,

        Defendant.


_____

Jonathan M. Bye, Meghan M. Elliot, and Richard J. Chadwick, Lindquist & Vennum, PLLP, Counsel for Plaintiff.

Richard W. Sobalvarro and Frederick L. Grunke, Rojkowski Hansmeier, and Tim Dalton Dunn, Dunn & Dunn, PC, Counsel for Defendant.


_____

## I.    INTRODUCTION

This case is before the Court on cross motions for summary judgment. [Doc. Nos. 18, 34.]  Plaintiff filed this declaratory judgment action seeking a declaration as to the parties' rights and obligations under a settlement of workers compensation subrogation rights.  Defendants filed a counterclaim.  Oral arguments were held on May 8, 2006.

## II.     FACTUAL BACKGROUND

### A.     <u>The Parties</u>

Plaintiff RTW is a Minnesota corporation with its principal place of business in Bloomington, Minnesota.  It is a third-party administrator for workers' compensation programs and workers' compensation insurers.

Defendant Carolina Casualty is an insurance company incorporated under the laws of the state of North Carolina with its principal place of business in Jacksonville, Florida.

### B.     <u>Subject Accident</u>

On December 12, 2002, Karen Hagen was injured in a collision on U.S. Highway 6, near Soldier Summit, Utah, when her automobile was struck by a semitrailer truck carrying a crane.  The semi was owned by Raymond M. Schmidt, d/b/a Schmidt Trucking Company and driven by Patrick A. McCone (jointly "truckers").  The semi lost control on a curve, crossed the centerline and tipped over onto its left side in front of Hagen.  Hagen collided with the boom of the crane and careened off the road.

### C.     <u>RTW Workers' Compensation Claim</u>

Hagen was entitled to workers' compensation benefits because she was in the course and scope of her employment with Colorado West at the time of the collision.  Colorado West was insured by ACIC, a wholly-owned subsidiary of RTW,

and Hagen's workers' compensation claims were administered by RTW.

Between the date of the collision and December of 2004, RTW paid out $133,812.93 for workers' compensation benefits to or on behalf of Hagen and was obligated to pay $29,773.22 for permanency benefits in installments through May 2007. By operation of Colorado's workers' compensation law, RTW had a subrogation claim from any money recovered by Hagen for economic and physical impairment against any third party legally liable for her injuries. Colo. Rev. Stat. § 8-41-203. Accordingly, Mark Daniels, RTW's Manager of Recovery Services, notified Hagen's counsel and Carolina Casualty's Claim Supervisor, Richard L. Gray, of RTW's subrogation claim to any recovery by Hagen related to the accident.

Hagen's attorney, Peter Collins, agreed that in the course of his representation of Hagen he would protect RTW's subrogation interest in return for RTW agreeing to pay a portion of his fee.

### D.    The Underlying Negligence Lawsuit

Collins filed a civil lawsuit in the United States District Court for the Central District of Utah on behalf of Hagen, asserting negligence on the part of the truckers. The damages sought included all amounts already paid by RTW.

Carolina Casualty, as insurer of the truckers, hired the law firm of Dunn & Dunn, P.C. of Salt Lake City, Utah, to defend against the suit. Clifford C. Ross, the

attorney retained by Carolina Casualty to represent Schmidt Trucking, handled the matter.  In August 2004, Carolina Casualty, through Ross, stipulated that the truck driver had operated the truck "in a negligent manner in connection with the subject collision," that "his negligence was the sole proximate cause of that collision," and that the truck driver was "liable for 100% of the damages determined by the jury to have been sustained by the Plaintiff, Karen Hagen, as proximate results of her injuries sustained in the collision."  (Bye Aff. Ex. G.) Thus, the only issue remaining for trial was the amount of damages owed to Hagen.

### E.    <u>The Settlement Between RTW and Carolina Casualty</u>

After a global settlement of Hagen's claims fell through, Ross attempted to settle RTW's subrogation claims separately.

Ross viewed a separate settlement with RTW as having some advantages. First, he believed that under Utah's collateral source rule, Hagen would have been entitled to recover the "retail" price of her medical care even though she would only have to return to RTW the discounted, or "wholesale" price that RTW had paid.  Ross hoped that by settling with RTW, he could keep the difference between the "retail" value and "wholesale" value out of Hagen's award.  Second, he hoped that the jury would appreciate Carolina Casualty's willingness to settle the workers' compensation claim, thus "taking the sting out of what happened."

(Ross Dep. 15.)  Third, he believed that if the judge kept the amount of Hagen's

medical bills from the jury, it might minimize the scope of her injury.  Fourth, he

hoped to eliminate Hagen's ability to recover prejudgment interest on the amount

of the medical bills.  Finally, Ross states that he was also motivated by the

prospect of future indemnity.  Ross's initial draft of the settlement contained the

precursor to the final indemnity provision as Paragraph 7.

Apparently based on a misunderstanding of Colorado law, Ross thought

that Carolina Casualty's vigorous defense against future medical expenses would

benefit RTW, as he believed that if the Hagen jury limited future medical

expenses, then Hagen would be barred from claiming these as part of her workers'

compensation claim.  In reality, RTW's interests were exactly opposite, if Hagen

received a large award for future medical expenses, then RTW would have been

entitled to require Hagen to exhaust those payments before asking for workers'

compensation.  Thus, RTW would benefit from a large award for Hagen, not from

a vigorous defense of Hagen's suit as Ross believed.

After weighing the risks and rewards of settling with RTW, Ross asked Rick

Gray, an adjuster for Carolina Casualty, to negotiate with RTW because he

thought that as an adjuster Gray "may be more successful in reaching a more

favorable outcome."  (Bye Aff. Ex. H.)

Gray, the individual who negotiated the contract on behalf of Carolina

Casualty viewed the benefit of entering into a settlement with RTW as being

absolved of future workers' compensation benefits to RTW.  When asked about the

negotiations he stated:

> Q:     Okay.  Do you recall any discussion with Mark [Daniels] in that
>        conversation about any situation in which RTW might have to
>        write a check back to Carolina Casualty?
>
> A:     No.
>
> Q:     Do you recall discussing with him, actually the word coming
>        up, indemnification or hold harmless?
>
> A:     Maybe not specifically hold harmless but I mean our
>        discussions were that this was it, you know, we were willing to
>        settle the workers' comp claim but we weren't going to pay any
>        more.  And so anything in the future would be their dollars,
>        not ours.
>
> Q:     Okay, So - - -
>
> A:     So if that's indemnification, I mean they agreed to settle with
>        us and release, you know, our insured from any future liens.
>
> Q:     So that again so, that RTW would not be knocking on your
>        door for any further monies?
>
> A:     Yeah, right.
>
> * * * * * *
>
> Q:     And at the time you reached agreement with Mark Daniels was
>        it your intent that depending on how much the jury awarded
>        [Ms. Hagen] that RTW might have to pay Carolina Casualty
>        some of that amount?
>
> A:     I hadn't thought of that to be honest with you.

6

Q:      When did that notion first come to your attention?

A:      When the trial was over.

(Gray Dep. 51-52, 54.)

On or about December 20, 2004, Daniels and Gray agreed that in exchange for Carolina Casualty's agreement to pay RTW $163,586.15 for the medical expenses and workers' compensation disability payments due to or payable by RTW, RTW would release the truckers and Carolina Casualty from any further liability for its workers' compensation subrogation claims with respect to Hagen's accident.

Ross drafted the Settlement Agreement on behalf of Carolina Casualty, and Joslin Wright, Ross's paralegal, e-mailed it to Daniels.

Daniels signed the document without consulting an attorney and faxed it back the next day.  Daniels noted in the cover letter that:

> This will conclude the matter of the claim that RTW has against Carolina Casualty Insurance and its insured . . .  I do want to ensure that this release in no way affects Ms. Hagen's claims that may remain outstanding.  These may include any compensation claim, or non-economic damages that she may have.  This release is meant to complete the claim to date, plus any claims that RTW may have in the future against your client(s) for any sums that RTW may be responsible for in the area of the workers compensation claim.

(Daniels Aff. Ex. G.)

Later, in forwarding Carolina Casualty's settlement check to Daniels, Gray wrote in his cover letter, "I thank you for your assistance in resolving this matter.

7

Attached is our check in the amount of $163,586.15 in settlement of ACIC

Insurance/RTW lien in this matter."  (Daniels Aff. Ex. I.)

### F.    The Hagen Trial

Prior to trial the court rejected Ross's strategy to limit the damages

considered by the jury, deciding instead to reduce the amount of the verdict by

the amount of the workers' compensation settlement.

Carolina Casualty tried the case to a twelve person jury and the jury

returned a verdict of $2,058,758.51 on January 13, 2005.  The jury allocated

$808,785.51 for past and future special damages including medical bills, lost

earnings, employment related benefits and household and personal services, and

$1,250,000 for general damages.  The court reduced the verdict by the

$163,586.15 Carolina Casualty paid RTW and then added pre-judgment interest to

come up with a final judgment amount of $1,935,611.95.

### G.    Carolina Casualty's Demand for Indemnity

After the verdict, Carolina Casualty sought to invoke Paragraph 8 of the

Settlement Agreement ["Agreement"], and requested that RTW indemnify it for

the amounts awarded for past and future special damages, less what it had paid

RTW, plus defense costs.  Paragraph 8 of the Agreement states as follows:

> 8.    [RTW] [d]oes hereby fully and completely release and forever
> discharge the Parties Released from and **agrees completely and
> fully to defend and indemnify** including the payment of costs,
> interest, prejudgment interest, and attorneys fees the Parties

8

Released from and against any and all claims, suits, demands, damages, and actions by the Employee Karen Hagen, her spouse and family members, her attorneys, and all persons or entities of any type claiming by or through the Employee for amounts arising from or in any way related to the Subject Incident including but not limited to amounts claimed or to be claimed for past, present, or future medical, hospital, mental health, or other health care expenses or costs, expenses, attorney's fees, loss of wages, loss of earnings, loss or impairment or earning capacity, household services, permanency, worker's compensation benefits whether claimed or not yet claimed, and all other amounts of Karen Hagen arising from or in any way relating to the Subject Incident.  This also includes without limitation all amounts of any type whatsoever which may be awarded to Plaintiff in the Subject Lawsuit for health care expense incurred or to be incurred, and all prejudgment interest, post-judgment interest, and costs on or related to such past, present, or future health care expenses.

(Daniels Aff. Ex. H, ¶ 8) (emphasis added.)

Carolina Casualty then made a post-verdict motion in the Hagen action for leave to file a third-party complaint.  This motion was denied.

In response, Daniels wrote the following in his notes, "[t]old Ross I was very upset that he had slipped this indemnification thing into the release, that I had never agreed to that in our discussions, and that he had specifically buried it to obfuscate the whole thing."  (Daniels Aff. Ex. N.)

The truckers and Carolina Casualty appealed the Hagen judgment.  In August 2005 Carolina Casualty settled the case by paying Hagen $1,850,000.

**H.**     **Procedural History**

RTW filed this lawsuit against Carolina Casualty on April 12, 2005.  This is a

declaratory judgment action wherein RTW seeks a declaration as to the parties'

rights and obligations under Paragraph 8 of the Agreement.  Carolina Casualty

filed a Counterclaim seeking judgment for the full amount of the truckers'

judgment, plus the attorney's fees incurred in defending the Hagen case on the

basis of breach of contract.  In its Answer, Carolina Casualty states that the

following affirmative defenses bar judgment in favor of RTW: waiver, release,

unclean hands, consent, acquiescence, ratification, legal justification, estoppel

and/or laches, and the Statute of Frauds.  RTW filed the instant motion for

summary judgment on February 10, 2006, arguing that (1) under Utah law, a

party is contractually obligated to assume ultimate financial responsibility for the

negligence of another only when that intention is "clearly and unequivocally

expressed" and (2) there is no such clear and unequivocal expression of such an

intent in this case.  Alternatively, RTW moves for summary judgment on the

grounds that even if the Agreement contained such clear expression of intent, it

should be reformed or rescinded on the basis of mistake, lack of consideration,

estoppel and/or laches, and is unconscionable.  Carolina Casualty filed its own

motion for summary judgment on May 1, 2006.

## III.    ANALYSIS

### A.    <u>Summary Judgment</u>

Summary judgment is appropriate if, viewing all facts in the light most

favorable to the non-moving party, there is no genuine issue as to any material

fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking

summary judgment bears the burden of showing that there is no disputed issue of

material fact.  Celotex, 477 U.S. at 323.  Summary judgment is only appropriate

when "there is no dispute of fact and where there exists only one conclusion."

Crawford v. Runyon, 37 F.3d 1338, 1341  (8th Cir. 1994) (citation omitted).


### B.    Choice of Law

Paragraph 10 of the Agreement provides that, "[t]he agreement shall be

governed by Colorado law where matters of Colorado worker's compensation are

involved, and otherwise by Utah law."  (Daniels Aff. Ex. H ¶ 10.)

Despite this language, Carolina Casualty argues that as the location where

the contract was formed, Minnesota law should apply to contract formation issues

and that Utah and Colorado law govern the contract interpretation issues.  The

Court finds that the parties consented through the Agreement to the application

of Utah law under these circumstances.

Minnesota generally recognizes choice of law clauses.  Nw. Airlines, Inc. v.

Astraea Aviation Servs., 111 F.3d 1386, 1392-93 (8th Cir. 1997) (applying law

provided for in choice of law clause to various claims, including to pre-contract

11

misrepresentation claims).  Moreover, the only case cited by Carolina Casualty for

the proposition that Minnesota law should apply is inapposite.  That case, <u>National</u>

<u>Union Fire v. D&L Construction</u>, 353 F.2d 169, 172-73 (8th Cir. 1965), provides no

support for Carolina Casualty's proposition as it involved a construction bond with

no forum selection clause.  RTW's claims for declaratory judgment and

reformation raise issues of performance under a settlement contract.  Even if not

explicitly contract interpretation issues, these claims are closely related to the

interpretation of the contracts and the Court finds that they fall within the ambit

of the express agreement that the contracts would be governed by Utah law.

Carolina Casualty thus consented to the application of Utah law regarding such

claims.

> **C.   <u>Whether RTW Made a Clear and Unequivocal Expression of
> Intent to Indemnify Carolina Casualty</u>**

Contract interpretation questions are to be decided as a matter of law.

<u>Utah Transit Auth. v. Salt Lake City S. R.R. Co.</u>, 131 P.3d 288, 290 (Utah Ct. App.

2006) (citation omitted).  The question of whether a contract is ambiguous is also

one of law.  <u>Jarman v. Reagan Outdoor Adver.</u>, 794 P.2d 492, 494 (Utah Ct. App.

1990).  Indemnity contracts are subject to the same rules of construction as other

contracts; thus, the court reads the contract as a whole and harmonizes and gives

effect to all provisions.  <u>Pavoni v. Nielson</u>, 999 P.2d 595, 599 (Utah Ct. App. 2000).

In the context of negligence, Utah courts have consistently held that an

"indemnity agreement which purports to make a party respond for the negligence of another should be strictly construed." Bishop v. Gentec, Inc., 48 P.3d 218, 224 (Utah 2002). Under this rule, there is a presumption against an intent to indemnify unless, "that intention is clearly and unequivocally expressed." Gordon v. CRS Consulting Eng'rs, Inc., 820 P.2d 492, 494 (Utah Ct. App. 1991) (citation omitted). To construe such agreements, courts may look at the "objectives of the parties and the surrounding facts and circumstances" in interpreting the contractual language. Id. (citation omitted). "Examining the surrounding facts and circumstances of a contract allows the court to place itself in the same situation in which the parties found themselves at the time of contracting. Ervin v. Lowe's Cos., Inc., 128 P.3d 11, 15 (Utah Ct. App. 2005) (quotation and citations omitted).

For the reasons that follow, the Court finds that the parties did not clearly and unequivocally agree that RTW would indemnify Carolina Casualty for Hagen's claims.

Although Paragraph 8 does use the terms "defend and indemnify," when viewed within the context of the Agreement as a whole, this provision is inconsistent and ambiguous.

First, reading the indemnity sentence of Paragraph 8 as providing a total indemnification obligation to RTW renders the entire Agreement senseless.

Paragraphs 1 through 3 define the parties in terms of the "Parties Released" and the "Releasing Parties."  These paragraphs evidence the parties' intention that RTW was releasing Carolina Casualty for amounts ultimately owed to RTW. Interpreting the extremely long indemnity sentence of Paragraph 8 as a contract wherein RTW agreed to indemnify Carolina Casualty transforms the purpose of the agreement and renders the labeling of RTW as a "Releasing Party" absurd. Suddenly, rather than a party absolving a debt, RTW becomes a party heavily indebted.

Additionally, Paragraph 9 is inconsistent with the notion that RTW was agreeing to indemnify Carolina Casualty for amounts awarded to Hagen.  Had complete indemnification been the parties' intent, then Paragraph 9 would have required Carolina Casualty to cooperate with, keep RTW apprised of, and confer with RTW regarding the Hagen trial.  Instead, Paragraph 9 requires the converse; it requires RTW to cooperate with Carolina Casualty.  Based upon a strict reading of Paragraph 8, Carolina Casualty could have washed its hands of the Hagen suit, with RTW to bear the entire burden simply by inserting a lone, contradictory sentence into the Agreement.

Analyzing these inconsistencies within the context of the heightened standard regarding indemnity agreements, the Court finds the language ambiguous.

14

Moreover, an examination of the facts and the circumstances surrounding the Agreement overwhelmingly reveal that RTW did not intend to indemnify Carolina Casualty.

First, inconsistent positions taken by Carolina Casualty show that even Carolina Casualty did not understand Paragraph 8 to include complete indemnity. In its initial demand for indemnification, Carolina Casualty asserted only that RTW would be responsible for <u>special</u> <u>damages</u> awarded during the trial. Furthermore, Ross, the drafter of the Agreement, testified that he did not intend to include indemnity for general damages.  (Ross. Dep. 85.)  Yet, Carolina Casualty now maintains that RTW must indemnify it for the <u>full</u> <u>judgment</u> <u>amount</u>, plus interest and attorneys' fees.  (Answer to Am. Compl. 10.) Additionally, had the parties actually intended for RTW to be ultimately responsible for indemnification, one would expect RTW to have taken part in the Hagen trial and to have been consulted before Carolina Casualty appealed and then negotiated a post-trial settlement with Hagen.  The Court finds each of these actions inconsistent with an indemnification obligation to RTW.

Second, the undisputed facts clearly reveal that Gray and Daniels, the parties who negotiated the settlement, did not contemplate indemnification.  The following evidence supports this assertion.

Gray admitted that he believed the Agreement meant that RTW would not

15

be "knocking at [Carolina Casualty's] door for future monies."  He clearly believed that the Agreement simply barred RTW from approaching Carolina Casualty in the future regarding claims submitted by Hagen to RTW; not that it would allow Carolina Casualty to seek additional payment from RTW.

The cover letter Daniels attached when he signed the Agreement stated, "[t]his release is meant to complete the claim to date, plus any claims that RTW may have in the future against your client(s) for any sums that RTW may be responsible for in the area of workers compensation claim."  (Daniels Aff. Ex. G.) This statement supports the conclusion that Daniels did not contemplate that RTW might have to turn around and pay money back to Carolina Casualty.

Further, Daniels testified that indemnification was never discussed during his negotiations with Carolina Casualty.  (Daniels Dep. 63, 83.)  Even Gray, as negotiator for Carolina Casualty, testified that it was not his intent that RTW would have to pay money back to Carolina Casualty.  (Gray Dep. 51-52, 54.) Moreover, Gray admitted that the advantages he contemplated for Carolina Casualty were that the court could exclude evidence of the wholesale value of medical costs, it might play favorably to a jury that Carolina Casualty was willing to settle with RTW, and the possibility of eliminating prejudgment interest.  (Gray Dep. 24-25, 32.)  Gray did not mention indemnification as a possible advantage.

Although there is some evidence that Ross, the attorney who drafted the

16

Agreement, contemplated indemnification, the Court does not find this fact

dispositive.  Because Ross did not participate in the negotiations, his intent cannot

trump that of the negotiator, Gray.  Since the overwhelming evidence reveals that

the negotiators of the contract did not contemplate indemnification, no

agreement to indemnify could have arisen.

Finally, the fact that the indemnification provision made no business sense

and provided no benefit to RTW is evidence that RTW did not intend to

indemnify Carolina Casualty.  Because the truckers had admitted 100% liability for

the accident and RTW had fixed past medical expenses, recovery on that amount

was almost guaranteed.  Thus, the Agreement did not reduce a risk of

nonrecovery.  Further, RTW was entitled to require Hagen to exhaust her

negligence award before claiming additional future medical expenses.  Therefore,

RTW would not necessarily have been obligated to pay future medical expenses.

By agreeing to indemnify Carolina Casualty, RTW would have assumed an

obligation it would not have had otherwise and in return would have received a

"vigorous defense" of future medical expenses.  This makes no sense when RTW

actually had an interest in a large award of damages.

The Court acknowledges that a party to an agreement generally has no

duty to ensure that the other party has a complete and accurate understanding of

all terms embodied in a written contract.  <u>John Call Eng'r, Inc. v. Manti City Corp.</u>,

17

743 P.2d 1205, 1207-08 (Utah 1987).  However, this lack of deliberation and senslessness of indemnification is merely one indicator among many that leads the Court to conclude that the parties did not intend for RTW to assume an indemnification obligation.

After taking each of these factors into consideration, the Court concludes that the negotiators of the Agreement did not even discuss an indemnification provision and no contract on this basis was formed.  Moreover, the drafter of the Agreement clearly misunderstood potential benefits to RTW and RTW stood to gain little by agreeing to take on a substantial indemnification.  Finally, had the parties intended for RTW to be responsible for Hagen's award, one would expect that RTW would have been given the opportunity to review defense strategy at trial and to approve the final settlement agreement.  Putting all the facts in the context of Utah law which requires a clear intent to assume responsibility for another's tort liability, the Court determines that RTW did not clearly and unequivocally agree to indemnify Carolina Casualty for damages awarded during the Hagen action.

###    D.    <u>**Reformation on the Grounds of Mutual Mistake**</u>

Although an equitable remedy is unnecessary since the Court has determined that no clear expression of intent to indemnify existed, the Court notes that the facts would also support the reformation of the contract on the

grounds of mutual mistake.

Under Utah law, "[r]eformation of an instrument for mutual mistake of fact is an equitable remedy that has long been recognized." Guardian State Bank v. Stangl, 778 P.2d 1, 4-5 (Utah 1989). In its "most simple and most straightforward sense, the law really only enforces the intent of the parties as to the fundamental agreement between them; a mistake in the recordation or memorialization of an agreement or document may not be exploited by one party to take advantage of the other." Id. at 6. In considering whether there was a mistake, the court may consider extrinsic evidence. Robert Langstrom, Ltd. v. McQuarrie, 741 P.2d 554, n.6 (Utah Ct. App. 1987.)

The present circumstances are similar to the issues decided by the Utah Supreme Court in Guardian State Bank, 778 P.2d at 4-5, where the court reformed a contract on the basis of mutual mistake. In that case, Guardian asserted that the contract at issue erroneously created a right never contemplated by the parties and that no consideration was given for the provision. Id. The court held that based on the undisputed facts Guardian had a right to reform the agreement by modifying the contract because of a mistake in the memorialization of the agreement. Id. at 8. The Utah Supreme Court considered the following factors:

> (1)   "it is clear that Guardian made a mistake by indorsing the [dealership's] note without limiting its own liability;"
>
> (2)   "there is no evidence that either party contemplated that

19

[Guardian] would be liable to Stangl;

(3)     "the very idea is contrary to what the parties intended to accomplish and is inconsistent with any kind of reasonable business transaction;"

(4)     Stangl testified that "indorsement of the note was never discussed.  The subject never arose;" and

(5)     the bank president who negotiated the transaction testified that he did not "understand or have any kind of understanding that [Stangl] was seeking any kind of endorser liability back against the bank," and flatly stated he would have refused to sign the documents if he had known that it was.

Id. at 7.

The Court finds that as in Guardian State Bank, the Agreement could be reformed based on mutual mistake since:

(1)     RTW clearly made a mistake in signing an agreement containing an indemnification clause;

(2)     there is no evidence that either party contemplated that RTW would be liable to Carolina Casualty;

(3)     the very idea is contrary to what the parties intended to accomplish and is inconsistent with any kind of reasonable business transaction;

(4)     Gray testified that indemnity was never discussed; and

(5)     Daniels testified that he did not understand that Carolina Casualty was seeking indemnity and flatly stated he would have refused to sign the Agreement if he thought it obligated RTW to indemnify Carolina Casualty.

This case differs slightly from Guardian because in the instant case the

20

drafter of the agreement intentionally inserted the indemnification provision, whereas in <u>Guardian</u> the court viewed the indemnification clause to have been inserted more or less in error.  However, the Court finds it rather disingenuous for Carolina Casualty to enjoy the benefits of adjusters negotiating with one-another and then claim that the attorney/drafter's state of mind should trump the negotiating parties' understandings.  Thus, the Court notes that even if RTW had displayed a clear and unequivocal intent to indemnify through Paragraph 8 of the Agreement, RTW would still be entitled to equitable reformation on the grounds of mutual mistake under Utah law.


Accordingly, based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.    Plaintiff's Motion for Summary Judgment [Doc. No. 18] is **GRANTED**.

2.    Defendant's Motion for Summary Judgment [Docket No. 34] is **DENIED**.


Dated: <u>September 18, 2006</u>                    <u>s / Michael J. Davis</u>
                                                     Judge Michael J. Davis
                                                     United States District Court